Lisa Vannett,                 )
                            )    **ORDER GRANTING DEFENDANT'S**
         Plaintiff,     )    **MOTION FOR SUMMARY JUDGMENT**
                            )    **AND DENYING PLAINTIFF'S MOTION**
    vs.                     )    **FOR SUMMARY JUDGMENT**
                            )    (Not For Publication)
Carolyn W. Colvin, Acting Social Security  )
Administration Commissioner,       )    Case No. 4:15-cv-091
                            )
         Defendant.    )

_____

      The plaintiff, Lisa Vannett ("Vanett"), seeks judicial review of the Social Security Commissioner's denial of her applications for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). This court reviews the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## I.    BACKGROUND

### A.    Procedural history

      Vannett filed applications for DIB and SSI on May 31, 2012. (Tr. 257-264). Therein she alleged a disability onset date of January 1, 2007. (Id.). She subsequently amended her alleged onset date to April 26, 2012. (Tr. 60). Her applications was denied initially and upon reconsideration. (Tr. 193-204).

      At Vannett's request, an Administrative Law Judge ("ALJ") convened an administrative review hearing on December 15, 2013. (Tr. 56-114, 206-07, 226-231). On January 22, 2014, the ALJ issued a written decision denying Vannett's applications. (Tr. 14-39). The Appeals Council denied Vannett's subsequent request for review and on May 11, 2015, adopted the ALJ's decision as the Commissioner's final decision. (Tr. 1-3).

Vannett initiated the above-entitled action, seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). The parties have since filed summary judgment motions that are now ripe for review. They have also filed notice of their consent to the undersigned's exercise of jurisdiction over this matter.

### B. Factual background

#### 1. Vannett's personal data and work history

Vannett stands five feet four and one-half inches tall. (Tr. 60). At the time of her administrative hearing she was 34 years old and weighed 296 pounds. (Tr. 60-61). She has a high school diploma. (Tr. 62). She is unmarried and has no children. (Id.). She lives with her boyfriend. (Tr. 61).

Vannett was self employed as childcare/daycare provider (for one child) from January through June 2008. (Tr. 309, 314, 317, 373). She has also worked as a cashier, customer service representative, support staff for individuals with developmental disabilities, and a certified nurse's assistant. (Tr. 296-303, 332, 373). She was most recently employed as a cashier in the food services industry. (Id.). She has not engaged in any substantial gainful activity since April 2012. (Tr. 62). She subsists on her boyfriend's income and food stamps. (Tr. 61).

Vannett suffers from recurrent plantar fasciitis and posterior tibial tendonitis of the right foot, a degenerative disc disease of the lumbar spine, a thorasic bone spur; morbid obesity; diabetes mellitus; attention deficit hyperactivity disorder ("ADHD"); major depressive disorder; and borderline intellectual functioning. (Tr. 20). She has also complained of asthma, vision problems, insomnia, memory issues, and chronic pain secondary to her ongoing back and foot issues. (Tr. 63). She has at one time or another been prescribed Albuterol, Flovent, and Servent for her asthma,

Cymbalta for her depression, Lantus, Meformin, Novalog, and Ongyiaza for her diabetes mellitus, Vyvanse for her ADHD, Ambien for her insomnia, and Gabapentin, Hydrocodone, and a Lidoderm patch for her pain. (Tr. 333). She has also been prescribed Lisinpril for high blood pressure and Lovasa for high cholesterol. (Id.).

##    2.    Summary of Vannett's relevant medical history

Vannett thrice presented to the emergency room on April 2011 complaining of lower back and sinus pain. (Tr. 435-440, 441, 445-47). Each time she was given either prescribed medication or given injections to alleviate her pain and thereafter discharged in stable condition. (Id.).

On April 28, 2011, Vannett presented to Dr. John Gillman for a psyshiatric evaluation and treatment for persistent lower back pain. (Tr. 441-43). Dr. Gillman recommended that a conservative course of treatment that included physical therapy and exercise with the use of analgesics and muscle relaxers. (Tr. 443). He further advised Vannett to follow up with the physiatry clinic. (Id.).

Vannett reported to Dr. Martire for physiatry followups every 84 days beginning in May 2011 and ending in March 2012. (Tr. 391-394). Following each visit, Dr. Martire's noted that Vannett suffered from persistent neck and back pain but that the Daypro had helped to alleviate some of the swelling in her ankle, that she was doing home exercises, that Lorcet had significantly helped with the pain and that she was stable. (Id.).

Meanwhile, Vannett began regularly reporting to North Central Human Services seeking assistance in managing her depression and ADHD. (Tr. 397-400, 534-59. She also reported periodically to a family nurse practitioner ("FNP") for "diabetes followup." (Tr. 448-450, 453-54).

On June 6, 2011, Vannett presented to Dr. Chi Yeung with incontinence issues. (Tr. 455-56). In Dr. Yeung's opinion, Vannett's incontinence issues were directly attributable to her weight and that she was not a candidate for surgical intervention. (Id.).

On June 30, 2017, she returned to Dr. Gillman, who, in addition to recommending physical therapy, renewed her prescription for acetaminophen-hydrocone and scheduled her for a therapeutic injection to the her left socroiliac joint. (Tr. 451-52). .).

Vannett went to physical therapy four times between June 7, 2011, and July 19, 2011. (Tr. 457-62). On July 4, 2011, she returned to Dr. Gillman, for a followup examination. According to the treatment notes, Vannett reported that her therapy had been helping her. (Tr. 463-64). Nevertheless, it appears that Vannett never returned for additional therapy following her July 19th session. (Tr. 462).

On August 2, 2011, Vannett presented to the emergency room with a headache, abdominal pain, and nausea. (Tr. 465-70). A CT scan of her head was normal. (Id.). She was given IVs of fenanyl and Zofran. (Tr. 469). Her headache, pain, and nausea thereafter resolved and she was discharged. (Id.).

On August 9, 2011, Vannett returned to Dr. Gillman for a followup examination. (Tr. 471-73). According to Dr. Gillman's notes, Vannett complained of head pain that rated an 8 and lower back pain on her left side that rated a 6. (Tr. 471). Dr. Gillman renewed her prescription for hydrocodone with acetaminophen, started her on a trial of Phenergen, rescheduled her therapeutic left sacroiliac injection, and recommended that she "continue conservative management with activity modification, home exercise modality program, and analgesic medication." (Id.).

On September 12, 2011, Vannett reported FNP Ler to for a diabetes and cholesterol checkup.

(Tr.  472).  In her notes, FNP Ler documented Vannett's lack of adherence to her medication along with the fact she had elevated liver function tests.  (Tr.  473).

The next day Vannett report to Dr.  Gillman for the left sacroiliac injection.  (Tr.  476-78). She also followed up on her elevated liver function tests with  an FNP.  (Tr.  474),  Suspecting that the test results could have been aggravated by certain medications prescribed to Vannett,  the FNP cut the dosage of certain medications and further advised Vannett to modify her diet.  (Tr.  475).

On September 13, 2011, Vannett underwent an abdominal ultrasound, the results of which showed fatty infiltration.  (Tr.  479).  On September 23, 2011, she again met with FNP Ler, who advised her to remain on her current regimen and submit to a recheck of her liver function.  (Tr. 481).

On September 28, 2011, Vannett presented to Dr.  Gillman.  According to the clinic notes, Vannett reported that she had experienced temporary relief following the injection but her pain had returned.  (Tr.  482).  Dr. Gillman administered a left gluteal trigger point injection and directed her to follow up as necessary.  (Tr.  482-83).

On October 17, 2011, Vannett presented the emergency room complaining of a frontal headache and nausea.  (Tr.  485)  According to the treatment records, her headache and nausea resolved after a couple of hours and she was discharged in stable condition.  (Tr.  489).

On October 21, 2011, Vannet presented to a FPN  complaining that her headache and nausea had returned.  (Tr.  490).   The FPN ordered Vannett stop taking  pain medication and started her on a Z-Pak.  (Tr.  491).

On October 25, 2011, Vannett returned to the FNP  to follow up on her liver function tests and diabetes.  (Tr.  492).  According to the FNP Vannett's diabetes was not controlled but had

nevertheless improved. (Tr. 493).

On October 26, 2011, Vannet presented to Dr. Kellenberger with complaints of chronic headaches. (Tr. 494-497). Based upon the his examination of Vannett and review of her medical history, Dr. Kellenberger concluded that the headaches were secondary to underlying recurrent sinusitis. (Tr. 496). He recommended that she curtail her consumption of painkillers, adopt a healthier lifestyle, and submit to physical therapy. (Id.).

On November 4, 2011, Vannett presented to the emergency room complaining of facial pain. (Tr. 501-505). A CT scan showed a possible periapical abscess alongside one of her teeth. (Tr. 503-04). She was given some educational materials, started her on an antibiotic, and told to follow up with a dentist or her primary care provider. (Id.).

On November 6, 2011, Vannett called Dr. Charles Swenson to report that she was suffering from recurrent headaches. (Tr. 484). Dr. Swenson instructed her to, amongst other things, take over-the-counter headache medicine as necessary. (Id.).

On November 7, 2011, Vannett presented to Dr. Sandeep Sule with a "sinus headache." (Tr. 505-06). Finding nothing wrong with her, Dr. Sule referred her to neurology for further evaluation. (Tr. 506).

Meanwhile Vannett continued to report to Dr. Gillman. (Tr. 507-10, 514-15). At each visit Dr. Gillman renewed her prescriptions medications and administered additional left gluteal trigger point injections. (Tr. 507-08, 515, 520-21).

On December 20, 2011, Vannett returned to the FNP for a diabetes followup. (Tr. 511-12). According to the FNP's notes, Vannett's liver functions stabilized and that she was exercising three days per week at the YMCA. (Tr. 512).

On February 11, 2012, Vannett presented to Dr. Ann Hoffman with right foot pain. (Tr. 516-19). Concluding that Vannett was suffering from plantar fascitis, Dr. Hoffman prescribed her oxycodone and directed her to follow up with Dr. Gillman as needed. (Tr. 518).

On February 24, 2012, Vannett presented to the emergency room complaining of left groin and buttock pain. (Tr. 522). She underwent a pelvic ultrasound, the results of which were normal. (Tr. 526). She was diagnosed with pelvic inflammatory disease, given a prescription for painkillers and discharged. (Tr. 524-25). She followed up with Dr. Timothy Bedell on March 12, 2012. (Tr. 532-33).

On April 4, 2012, an MRI was taken of Vannnett's thoracic spine. (Tr. 432). It confirmed that she was suffering from a degenerative disc disease. (Tr. 433).

On May 7, 2012, Vannett presented to a Nurse Practitioner with complaints of thoracic back pain. (Tr. 426-27). On examination she exhibited a normal gait, and full strength in her lower extremities. (426) When asked to rate her pain on a scale of 0 to 10, she responded that it was a 7. (Id.).

On May 9, 2012, Dr. Martire terminated his relationship with Vannett via letter. (Id.). In subsequent correspondence with Vannett's attorney, he declined to fill out a physical capacities evaluation for Vannett and further recommended that she submit to a 2-day functional capacity assessment. (Tr. 396). In so doing he offered the following:

> Ms. Vannett does not have any history of surgery. She has chronic mechanical neck, middle and low back pain. I feel she would most likely be more of a light duty category where she needs to change positions as need. I do not feel, based on her physical diagnoses, that she is unemployable. She most likely would be able to work only part-time or on a semi-time basis, as this is only what she has been capable doing in the past.

(Id.).

On May 26, 2012, Vannett presented to the emergency room with what was subsequently diagnosed as sinusitis. (Tr. 429-431). She given prescriptions for an antibiotic and pain killers and discharged. (Tr. 431).

On June 22, 2012, Vannett presented to an FNP for a "followup of her diabetes." (Tr. 423-425). Noting that Vannett's diabetes was uncontrolled, the FNP encouraged Vannett to engage in activity, lose weight, and eat healthier. (Tr. 424).

On June 22, 2012, Vannett reported to Dr. Michael Templar with multiple pain complaints. (Tr. 415-17). She was given a trial of Neurotonin along with a prescription for Robaxin, a muscle relaxer, and directed to return in 1 month. (Tr. 416).

On August 23, 2012, Vannett reported to the emergency room with complaints of back pain. (Tr. 410-414). According to the treatment notes, she was diagnosed with a thoracic sprain. (Tr. 414). She was issued a prescription for acetaminophen-hydrocodone and discharged. (Id.).

On September 15, 2012, Vannett reported to the emergency room with back pain, thoracic pain, and exacerbation of chronic pain from a bone spur. (Tr. 405-07). She was given educational materials and discharged. (Tr. 407).

On September 20, 2012, Vannet reported to Dr. Michael Templer with complaints of a recent onset of neck pain and headaches, the intensity of which she rated as a 7 on a scale of 0 to 10. (Tr. 403-04). Dr. Templer scheduled her for an MRI. (Id.).

On September 21, 2012, Vannett reported to a FNP for a "followup on her diabetes and lipids." (Tr. 408-09). Noting that Vannett's diabetes was not well controlled, the FNP adjusted her medications and directed her to return in 3 months. (Tr. 409).

Vannett began doctoring at the UND Center for Family Medicine in late October 2012. She

thereafter checked in regularly for followup evaluations for her chronic back pain and diabetes. (Tr. 564-88). The records of these visits suggest that her response to treatment was mostly positive. (Id.).

On December 4, 2012, Vannett presented to Dr. Tyson Williams complaining about severe pain in her right heel. (Tr. 652). Dr. Williams scheduled her for surgery to excise scar tissue that had built up following a previous surgery. (Id.)

On January 6, 2013, Vannett had surgery on her right foot. (Tr. 628-29). During a followup examination on February 20, 2013, she received cortisone shot to her central plantar fascia. (Tr. 647). She was subsequently referred for physical therapy (Tr. 590-82). Although she submitted to an assessment on May 29, 2013, it is not entire clear from the record whether she followed through on the recommended course of therapy. (Id.).

On April 28 , 2013, Vannett presented to the emergency room complaining of recurrent back pain. (Tr. 674-77). She was given an injection of Dilaudid and instructed to followup with her primary care provider as necessary. (Tr. 675, 677).

On May 6, 2013, Vannett presented to FNP Durand Jones complaining of back pain. (Tr. 643-44). FNP Jones' plan was start Vannett on physical therapy for her next and trapezius muscles, order an MRI and bone scan, and encourage her to continue getting her pain medications through her primary physician. (Tr. 644).

On July 3, 2013, Vannett returned to FNP Jones. (Tr. 639-42). In his notes, FNP Jones stated that Vannett was under no acute distress, that her MRIs and CT scans did not show any areas that required neurosurgical intervention, and that she was being referred to the pain clinic. (Tr. 641-42).

On August 26, 2013, Vannett presented to Dr. Frashant Morolia with complaints of lower

back and right leg pain. (Tr. 599-600). According to the examination notes, an MRI of her lower back revealed a disk fragment at T11-T12. (Tr. 600).

On September 13, 2013, Vannett presented to Dr. Tyson Williams with level 8 pain in her right foot and pustules on the right 4th toe. (Tr. 636). Dr. Williams recommended that she use a soft orthotic on her right heel, took a culture of the pustules, and prescribed an oral antibiotic as a precautionary measure. (Id.). The cultures came back negative for staph. (Tr. 638).

### 3. "Function Report"

Vannett's mother, Renee, submitted a "Function Report" to the Commissioner on Vannett's behalf. Therein, Renee stated that Vannett could stand no more than 1 hours without swelling, could lift no more than 5 pounds at a time, was forgetful, tired quickly, needed assistance when dressing and bathing, had limited social contact with others, and performed few chores around the house. (Tr. 347-54).

Renee subsequently wrote to the Commissioner, reiterating that Vannett was under great physical, mental, and financial strain and asserting prospective employers did not consider Vannett to be employable on account of her health issues. (Tr. 356).

### 4. Consulting Physician Reports

### a. Psychological Assessments

Social Security Disability Determination Services referred Vannett to Dr. Timothy Eaton, a licensed clinical psychologist, for evaluation in March 2012. (Tr. 386-389) Based upon his observations and test results, Dr. Eaton concluded:

> The results of the present evaluation reveal an individual with overall intellectual functioning in the borderline range, and memory fluctuates that would be commensurate with these abilities. She has not likely suffered from any memory deterioration, but her memory likely is affect by variable attentional performances

as well as simply more limited abilities. She will have a tendency to be very forgetful and easily overwhelmed with any significant job task, although should be able to do relatively basic manual labor type tasks depending on how much her physical conditions affect her abilities. This appears to the be primary problem for Ms Vannett, as she has primarily focused on jobs she can do within her abilities in the past but her physical limitations have now made those jobs even more difficult for her. Her depressive symptoms appear to be somewhat better although are still fragile and her attention deficit appears to be reasonably managed with current medication.

(Docket No. 389).

### b. Physical Assessments

### (i) Dr. Marlin Johnson

Dr. Marlin Johnson conducted a "paper review" of Vannett's records at the Commissioner's behest in October 2012. (Tr. 145-150). Therein he acknowledged that Vannett suffered from medically determinable impairments, all of which he considered severe save two--asthma and diabetes mellitus. (Tr. 145). He also acknowledged that Vannett suffered from organic mental disorders and affective disorders but added that they only mildly impacted her ability to engage in daily activities, maintain social functioning, and maintain concentration, persistence, and pace. (Tr. 146). When weighing the opinion evidence, he afforded great weight to Dr. Martire's statements. but discounted Vannett's self assessment on the grounds that she was prone to overstatement. (Id.). With respect to Vannett's residential function capacity, Dr. Johnson determined that she remained capable of: (1) frequently lifting and/or carrying 10 pounds; (2) standing and/or walking for a total of 2 hours; (3) sitting for more than 6 hours on a sustained basis in an 8-hour workday; (4) occasionallying climb ramps/stairs, ropes/ladders/scaffolds; and (5) occasionally balancing, stooping, kneeling, crouching, and crawling. (Tr. 148).

### (ii)     Dr. Ernest Goodfried

The record contains a second "paper review" of Vannett's records by Dr. Ernest Goodfried in December 2012. (Tr. 168-176). Dr. Goodfried's findings mirrored those in Dr. Johnson's earlier review. (Id.)

### 5.     Administrative hearing

### a.     Vannett's testimony

Vannett testified that she is unable to work on a regular basis because of her depression, chronic foot and back issues, difficulties in managing her diabetes, and insomnia. (Tr. 61-63). When asked to elaborate, she testified that: her foot swells when standing on it for more than thirty minutes at a time; she is bipolar; her depression leaves her feeling unmotivated; she finds it next to impossible to maintain a regular sleep schedule and what little sleep she is able to get is generally fitful; fluctuations in blood sugar leave her feeling "shaky," she fatigues very easily, and she suffers from chronic pain that averages out to a seven or eight on a scale of one-to-ten. (Tr. 63-65, 71, 78-80, 82-83). She also testified that her pain is exacerbated when standing, sitting, or lying down for extended periods of time and that her prescription painkillers are minimally effective.

With respect to her daily routine, Vannett testified as follows. She does not drive and can do very little on her bad days. On her good days she attends to her personal needs, wash clothes (assuming that she can get a ride to a laundromat), does some light cleaning around her apartment, and cooks her boyfriend a meal and/or goes out for coffee with her mother. (Tr. 77-78, 83-86). She also crafts as her conditions permits, tries to go for a short walk every day, and reads up to one-hour daily (but struggles to comprehend and retain what she is reading). (Tr. 73-76, 86-88).

When queried about her social life, Vannett testified that she does not venture out often, that

she is averse to crowds, and that her social circle consists primarily of family members. When asked whether she uses a computer or access the Internet, Vannett responded that she currently does little on the computer other than periodically checking her Facebook account. She did, however, acknowledge that, in 2013, she had enrolled in an number of online courses with the aim of obtaining her degree in social work. (Tr. 89). In so doing she advised that, with help from tutors, she had made the Dean's list her first quarter but dropped out after her second quarter due to plummeting grades. (Tr. 92-94).

When asked to elaborate on her physical limitations and attendant discomfort, Vannett testified that the swelling in her foot precluded her from standing for more than 30 minutes at a time, that she has to elevate her foot to alleviate the swelling, that she can sit no more than 45 minutes, and that she can lift no more than 5 pounds at a time on account of her back. (Tr. 95-96 ). She further testified that she oftentimes struggles to get of bed, change out of her pajamas, and shower and she finds it difficult to maintain her focus/concentration for more than an hour. (Tr. 98).

### b. Chad Charboneau's testimony

Vannett's boyfriend, Chad Charboneau testified that Vannett commonly experienced mood swings, that she has difficulty getting out of bed, that her overall health has been and continues to deteriorate, and that, despite her best efforts, and that she requires assistance to perform routine household chores. (Tr. 105-106). When asked whether Vannett suffered from any observable mental or emotional difficulties, he responded in the affirmative. (Tr. 106-07).

### c. Vocational expert's testimony

#### (i) ALJ's inquiries

The ALJ posed four hypotheticals to the vocational expert. First, she inquired whether a

hypothetical individual of Vannett's age, education, and vocational background could perform Vannett's past relevant work if she: (a) could lift and or carry 10 pounds occasionally and less than 10 pound frequently; (b) could sit for 7 hours and either stand or walk for 2 hours in an 8-hour work day; (c) could remain in one position for no more than 15 minutes at a time; (d) could occasionally climb stairs and ramps; (e) could never climb ropes, ladders, or scaffolds; (f) could occasionally balance, stoop, kneel, crouch, and crawl; (g) should not be exposed to unprotected heights or moving mechanical parts; and (h) could understand, remember, and carry out simple tasks. (Tr. 108-110). The vocational expert responded in the negative. (Tr. 110).

Second, the ALJ inquired whether this hypothetical could perform any other work. (Id.). The vocational expert responded that such a person should be capable of performing some sedentary work as a order clerk, account clerk, assembler, for example, so long as she lifted no more than 10 pounds and sat no more than 6-hours in a day with 15 minute intervals of standing. (Id.).

Third, the ALJ inquired whether this hypothetical person could still perform such sedentary work on a competitive basis if she could be expected to miss 2 days of work per week. (Tr. 111). The vocational expert responded that such a high rate of absenteeism was not compatible with full-time employment. (Tr. 111).

Fourth, the ALJ inquired whether this hypothetical person's ability to work would be compromised if she were to required to elevate her foot to waist level for one quarter of each work day. (Tr. 111-112). The vocational expert responded that the need to elevate one's foot on a box, say 8 to 12 inches in height, would pose no obstacle to employment but that the need to elevate one's foot to heart- level would essentially rule out competitive employment. (Tr. 112).

### (ii)     Counsel's Inquiry

Vannett's counsel first inquired whether an employer would tolerate an individual who was required to leave the work area to or three times an hour.  (Id.).  The vocational expert responded that it was unlikely such "breaks" would be tolerated.   (Id.).  Counsel next inquired whether an inability to focus/concentrate for two-hours at time or an inability to complete a shift inability to complete shifts posed a barrier to competitive employment.  (Tr.  112-13).  The vocation expert responded  in the affirmative.  (Tr.  113).

### C.     ALJ's Decision

The ALJ employed the five-step sequential analysis when evaluating Vannett's application.  At step one, the ALJ concluded that Vannett (1) met the insured status requirements of the Social Security Act through December 31, 2012, and (2) had not had not engaged in any substantial gainful activities since April 26, 2016, the amended alleged onset date.  (Tr. 19).  At step two, the ALJ acknowledged that Vannett suffered from the following severe impairments: recurrent plantar fasciitis and posterior tibial tendonitis of the right foot; degenerative disc disease of the lumbar spine; thoracic spine bone spur; morbid obesity; diabetes mellitus; attention deficit hyperactivity disorder ("ADHD"); major depressive disorder; and borderline intellectual functioning.  (Tr.  20).  Conversely, the ALJ concluded that Vannett's asthma did not constitute a severe impairment as the record did not evidence she required any ongoing treatment for it.  (Id.).  The ALJ also rejected Vannett's allegation that she suffered from vision limitations on the ground that it was not borne out by her medical records.  (Id.).

Moving on to step three, the ALJ concluded that none of Vannett's aforementioned impairments, either singly or in combination, were presumptively disabling.   (Tr.  21-22).

At step four, the ALJ made the following determination with respect to Vannett's residual function capacity:

> [T]he claimant has the residual functional capacity to perform less than the full range of sedentary work as defined by 20 CFR 404.1567(a) and 416.967(a). Specifically, the claimant can occasionally lift and/or carry 10 pounds and frequently lift and/or carry less than 10 pounds. She can stand and/or walk (with normal breaks) for a total of about 2 hours in an 8-hour workday, and sit (with normal breaks) for a total of about 2 hours in an 8-hour workday. The claimant is limited to standing or walking 15 minutes at one time, and then needs to sit down. She can occasionally climb ramps and stairs, but can never climb ladders, ropes, or scaffolds. The claimant can occasionally balance, stoop, kneel, crouch, and crawl and can occasionally use foot controls on the right. Mentally, the claimant can understand, remember and carry out simple instructions.

(Tr. 23). In making this determination, the ALJ acknowledged Vannett's medically determinable impairments could reasonably be expected to cause her alleged symptoms. (Tr. 25). However, he did not fully credit Vannett's testimony regarding the intensity, persistence, and limiting effects of her symptoms, citing: (1) inconsistencies in Vannett's testimony regarding her computer usage, social interaction, and sleep disruption; (2) inconsistencies in Vannett's testimony regarding her ability to maintain focus and to attend to her personal needs; (3) inconsistencies between Vannett's testimony at the administrative hearing and statements attributed to her by treatment providers in their examination reports; (4) the dearth of evidence demonstrative of her need for mental health treatment other than periodic medication management; and (5) the results of a psychological consultative examination conducted on March 5, 2012. (Tr. 29-36).

The ALJ likewise discounted statements made by Vannett's mother, Renee, in a "Third Party Function Report" and testimony from Vannett's boyfriend, Chad Charboneau, regarding Vannet's residential functional capacity of because their general lack of expertise in this area and a lack of supported in the record as a whole. (Tr. 36).

The ALJ did, however, credit an opinion expressed by Vannett's treating gynecologist, Dr. William Madland, following his examination of Vannett in March 2013. (Id.). In his examination report, Dr. Madland indicated that Vannet's medical condition would improve with weight loss. (Tr. 36-37).

At the fifth step, the ALJ recognized that Vannett was incapable of performing her past relevant work. (Tr 37-38). The ALJ was nevertheless of the opinion that Vannett was capable of making an adjustment to other sedentary and unskilled work that exists in significant numbers in the national economy. (Tr. 38-39). Consequently, ALJ concluded that Vannettt was not disabled as defined by the Act. (Tr. 39).

## II.    GOVERNING LAW

### A.    Law governing eligibility for adult benefits

An individual shall be considered to be disabled for purposes of DIB if the person is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. E.g., Hilkenmeyer v. Barnhart, 380 F.3d 441, 443 (8th Cir. 2004); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); see 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

In deciding whether a claimant is disabled within the meaning of the Act, the ALJ is required to use the five-step sequential evaluation mandated by 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)[1] and determine:

(1)    whether the claimant is presently engaged in a substantial gainful activity,

_____

[1] The provisions in 20 CFR Part 404 apply to DIB and the provisions in Part 416 apply to SSI benefits.

(2)     whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities,

(3)     whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations,

(4)     whether the claimant has the residual functional capacity to perform his or her past relevant work, and

(5)     if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

If the ALJ reaches the fourth or fifth steps, the ALJ must determine a claimant's residual functional capacity ("RFC"), which is what the claimant can do despite his or her limitations. 20 C.F.R. §§ 404.1545, 416.945. The ALJ is required to make the RFC determination based on all relevant evidence, including, particularly, any observations of treating physicians and the claimant's own subjective complaints and descriptions of his or her limitations. Pearsall v. Massanari, 274 F.3d at 1218.

In evaluating a claimant's subjective complaints, the ALJ is required to assess the claimant's credibility in light of the objective medical evidence and "any evidence relating to: a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors, and functional restrictions." Id. In this circuit, these are referred to as the "Polaski factors" after the Eighth Circuit's decision in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).[2] E.g., Ellis v. Barnhart, 392 F.3d 988, 993-996 (8th Cir. 2005) ("Ellis"). A claimant's subjective complaints may be discounted only if found to be inconsistent with the record taken as a whole. Pearsall v. Massanari, 274 F.3d at 1218.

**B.     Standard of review**

---

[2] The Polaski factors are now embodied in 20 C.F.R. §§ 404.1529, 416.929.

The scope of this court's review is limited. The court it is not permitted to conduct a *de novo* review. Rather, it must look at the record as a whole to determine whether there is substantial evidence to support the Commissioner's decision. <u>Ellis</u>, 392 F.3d at 993.

Substantial evidence is less than a preponderance, but more than a scintilla of evidence. <u>E.g.</u>, <u>Buckner v. Astrue</u>, 646 F.3d 549, 556 (8th Cir. 2011) ("<u>Buckner</u>"). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Nelson v. Sullivan</u>, 966 F.2d 363, 366 n.6 (8th Cir. 1992) (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 401(1971)).

Under the substantial evidence standard, it is possible for reasonable persons to reach contrary, inconsistent results. <u>Culbertson v. Shalala</u>, 30 F.3d 934, 939 (8th Cir. 1994). Thus, the standard "embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." <u>Id.</u> Consequently, the court is required to affirm a Commissioner's decision that is supported by substantial evidence - even when the court would weigh the evidence differently and reach an opposite conclusion. <u>Id.</u>; <u>Buckner</u>, 646 F.3d at 556 ("Rather, if, after reviewing the record, we find that it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the decision of the Commissioner.") (internal quotations and citations omitted).

In conducting its review, the court is required to afford great deference to the ALJ's credibility assessments when the ALJ has seriously considered, but for good reason has expressly discounted, a claimant's subjective complaints, and those reasons are supported by substantial evidence based on the record as a whole. <u>See</u> <u>Haggard v. Apfel</u>, 175 F.3d 591, 594 (8th Cir. 1999) ("<u>Haggard</u>"); <u>Brockman v. Sullivan</u>, 987 F.2d 1344, 1346 (8th Cir. 1993) ("<u>Brockman</u>"). The Eighth Circuit has stated, "Our touchstone is that a claimant's credibility is primarily a matter for the ALJ

to decide."  Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir. 2003) ("Anderson").

Nonetheless, the court's review is more than a search for evidence that would support the determination of the Commissioner.  The court is required to carefully consider the entire record in deciding whether there is substantial evidence to support the Commissioner's decision, including evidence unfavorable to the Commissioner.  Ellis, 392 F.3d at 993.

## III.    DISCUSSION

### A.    RFC Determination

Vannett asserts ALJ failed to adequately consider to her sleep disturbances, asthma, sleep apnea, obesity and SSR 02-1p, and how her obesity exacerbated her other impairments and otherwise limited her functioning. Next, she asserts that the her RFC as determined by the ALJ lack substantial evidentiary support.  Finally, she asserts that the ALJ failed to take into consideration her need for frequent breaks and to elevate her feet has well as the impact of frequent absenteeism and the inability to complete entire shifts.

The Commissioner disagrees, insisting that the ALJ gave due consideration to all of the Vannett's ailments, their impact on her functioning, and whether they prevented her from performing full time work on a sustained basis.  The Commissioner further avers that there was a dearth of evidence to support Vannett's assertion that she would require frequent unscheduled breaks.

SSR 02-1p acknowledges that obesity is a disease, the causes of which are not well understood.  It emphasizes that obesity is not always a mere function of overeating and failing to get enough exercise and that there may be intervening genetic and metabolic factors that are also significant. In relevant part it states the following:

Obesity is a complex, chronic disease characterized by excessive accumulation of body fat. Obesity is generally the result of a combination of factors (e.g., genetic, environmental, and behavioral).

In one sense, the cause of obesity is simply that the energy (food) taken in exceeds the energy expended by the individual's body. However, the influences on intake, the influences on expenditure, the metabolic processes in between, and the overall genetic controls are complex and not well understood.

. . . .

Treatment for obesity is often unsuccessful. Even if treatment results in weight loss at first, weight lost is often regained, despite the efforts of the individual to maintain the loss.

SSR 02-1p states that obesity can lead to, or complicate, many other diseases and conditions, including, relevant to this case, chronic diseases involving the musculoskeletal body systems. It also states that the "effects of obesity may be subtle, such as the loss of mental clarity and slowed reactions that may result from obesity-related sleep apnea."

SSR 02-01p sets forth three levels of obesity: Level I includes a body mass index ("BMI") of 30.0 - 34.9; Level II a BMI of 35.0 - 39.9; and Level III (also known as "extreme" obesity), includes BMI's greater than 40. It further states that "these levels describe the extent of obesity, but they do not correlate with any specific degree of functional loss."

In determining a claimant's residual function capacity, "the ALJ must consider the effects of the combination of both physical and mental impairments," Stormo v. Barnhart, 377 F.3d 801, 807 (8th Cir. 2004), to "determine whether the combination of . . . impairments is medically equal to any listed impairment," Shontos v. Barnhart, 328 F.3d 418, 424 (8th Cir. 2003) (quoting 20 C.F.R. § 404.1526(a)).

A close reading of the ALJ's decision confirms that the ALJ did just that; the ALJ summarized Vannett's medical records and discussed each of Vannett's impairments, including

Vannett's physical and mental health, obesity, pain complaints, attention deficits, cognitive functioning, asthma, and sleep disturbances. (Tr. 18-23). For example, the ALJ noted Vannett's history of asthma and the fact that she had been prescribed medication for it. (Tr. 20). The ALJ also took note of Vannett's admission that she had not diligently taken her medications as well as the dearth of medical records to suggest that she required ongoing treatment for her asthma. (Id.). With respect to the issue of Vannett's weight, the ALJ's determination appears to have been informed by SSR 000-3p; ALJ considered the fact that Vannett's BMI was "extreme" and that her obesity resulted in functional limitations, exacerbated her other impairments, and otherwise constituted a severe impairment when assessing Vannett's residual functional capacity. (Tr. 21, 26-27). As Vannett's sleep disruptions, the ALJ concluded they were attributable to preferred sleep habits as opposed to any medical conditions. (Tr. 34-350. In so doing, the ALJ cited to reports to indicate that Vannett had been prescribed sleep medication, had established a good sleep pattern and was getting between 8 and 9 hours of sleep per night as of December 2012, and later experienced difficulties in getting to sleep at night due in part to the fact that she was sleeping throughout the day. (Id.).

Consequently, the undersigned concludes that the ALJ properly considered Vanett's combined impairments and their impact on her ability when determining Vannett's residual functional capacity.

**B.**     **Credibility Determination**

Vannnett also takes exception to the ALJ's credibility determination, asserting that her subjective complaints are borne out by the record.

Not surprisingly, the Commissioner disputes Vanett's characterization of the record and

maintains there was substantial evidence in the record to support the ALJ's credibility determination. In so doing, she highlights inconsistencies in the record.

In evaluating a claimant's subjective complaints, the ALJ is required to assess the claimant's credibility in light of the objective medical evidence and "any evidence relating to: a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors, and functional restrictions." Id. In this circuit, these are referred to as the "Polaski factors" after the Eighth Circuit's decision in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984). E.g., Ellis v. Barnhart, 392 F.3d 988, 993-996 (8th Cir. 2005) ("Ellis"). A claimant's subjective complaints may be discounted only if found to be inconsistent with the record taken as a whole. Pearsall v. Massanari, 274 F.3d at 1218. The court should, "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." Perks v. Astrue, 687 F.3d 1086, 1091 (8th Cir. 2012) (quoting Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005)).

The record shows the ALJ considered multiple factors in assessing Vannett's credibility. First, the ALJ found that Vannett was prone to overstatement and that her testimony was consistent with the objective medical evidence in the record. Second, the ALJ took note Vannett's infrequent treatment for several of conditions, her violation of a her medication agreement, and the instances when failed to following her physicians instructions.

Having reviewed the record in its entirety, the court would not necessarily draw the same conclusions as those of the ALJ. Nevertheless, in the final analysis, the ALJ's interpretation of the statements made by Vannett are not beyond the pale and the court is mindful that it is prohibited from substituting its own judgment in place of the ALJ's interpretation or weigh the evidence de

novo. See Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998); Flynn v. Chater, 107 F.3d 617, 620 (8th Cir. 1997). As noted above, the ALJ's credibility assessments are entitled to great deference when the ALJ has seriously considered, but for good reason has expressly discounted, a claimant's subjective complaints, and those reasons are supported by substantial evidence based on the record as a whole. See Gregg v. Barnhardt, 354 F.3d 710, 714 (8th Cir. 2003) ("If an ALJ explicitly discredits the claimant's testimony and gives good reasons for doing so, we will normally defer to the ALJ's credibility determination.") The ALJ gave clear reasons for his credibility determination and there appears to be sufficient evidence in the record to support them.

## C.    Hypotheticals

Vannett asserts that the ALJ failed to ask the vocational expert a hypothetical question containing all of her limitations and therefore could not rely upon the vocational expert's testimony to conclude that she could perform other work that exists in the national economy.

Vannett's argument presupposes that the ALJ was required to include all of her subjective limitations in her hypothetical question to the vocational expert. However, as discussed above, the ALJ did not find Vannett's subjective complaints entirely credible. A proper hypothetical question need only include those impairments and limitations found credible by the ALJ. See Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006) (ALJ's hypothetical question to the vocational expert need only include those impairments that the ALJ finds are substantially supported by the record as a whole); Forte v. Barnhart, 377 F.3d 892, 897 (8th Cir. 2004) (same). Because the ALJ did not accept all of Plaintiff's subjective limitations, the ALJ was not required to include them in her hypothetical question to the vocational expert. Id.

## IV.    CONCLUSION

In this case, there is enough evidence supporting the Commissioner's decision to meet the

"substantial evidence" threshold and the decision to deny benefits falls within the zone of choice that prohibits this court from reversing the decision even though there is substantial evidence supporting a contrary outcome. Accordingly, Vannett's Motion for Summary Judgment (Docket No. 10) is **DENIED**, the Commissioner's Motion for Summary Judgment (Docket No. 13) is **GRANTED**, and that the above-entitled action is **DISMISSED**.

    **IT IS SO ORDERED.**

    Dated this 31st day of March, 2017.

                                               */s/ Charles S. Miller, Jr.*             
                                               Charles S. Miller, Jr., Magistrate Judge
                                               United States District Court